UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Edward Kobe,

        Plaintiff,

v.

Canadian National Railway Company,
a Canadian Corporation, d/b/a The Duluth,
Winnipeg and Pacific Railway, and The Duluth,
Winnipeg and Pacific Railway Company, a
domestic corporation,

        Defendants.

Civ. No. 06-3439 (RHK/RLE)
**MEMORANDUM OPINION
AND ORDER**

---

Michael W. Unger, Attorney at Law, PLLC, Minneapolis, Minnesota, for Plaintiff.

Diane P. Gerth, Julius W. Gernes, Scott H. Rauser, Spence, Ricke, Sweeny & Gernes, P.A., St. Paul, Minnesota, for Defendants.

---

**INTRODUCTION**

Plaintiff Edward Kobe alleges that he was injured during his employment with Defendants Canadian National Railway Company ("CN") and its subsidiary The Duluth Winnipeg and Pacific Railway Company ("DWP"). Kobe's Complaint asserts claims under the Federal Employer's Liability Act ("FELA") and the Federal Safety Appliance Act ("FSAA"). The following motions are before the Court: (1) Defendant CN's Motion for Summary Judgment, arguing that the Court should dismiss it from this case because it did not employ Kobe within the meaning of FELA; (2) Defendant DWP's Motion for

Partial Summary Judgment, arguing that the rail vehicle involved here was not "in use" when Kobe was injured; and (3) Kobe's Motion for Partial Summary Judgment, arguing that the rail car was "in use" at the time of his injury and that Defendants are liable under FELA for violating the FSAA.  For the reasons set forth below, the Court will deny Defendants' Motions and grant Kobe's Motion.

## BACKGROUND

### I.     The Parties

Kobe has worked as a freight-train conductor since the 1970s.  (Kobe Supp. Aff. at ¶ 2.)  DWP is a wholly owned subsidiary of the Grand Trunk Corporation ("GTC"), a non-operating holding company.  (Novak Aff. at ¶ 3.)  GTC is a wholly owned subsidiary of CN, a Canadian corporation, headquartered in Montreal, Quebec.  (Id. at ¶ 4.)

### II.    The Accident

On September 5, 2003, Kobe and engineer Bill Leggate were assigned to take train No. 118 from Rainer, Minnesota, to Duluth, Minnesota, where another crew would replace them.  (Unger Aff. Ex. 1 at 152, Ex. 5 at 32.)  This train had originated at the Symington Yard in Winnipeg, Canada, and was destined for Chicago, Illinois.  (Id. Ex. 5 at 27.)  Train No. 118 had completed its pre-departure inspections when the train was assembled at the Symington Yard.  (Id. at 28-29.)  The train contained priority freight and therefore was not to be delayed as it moved from station to station.  (Id. Ex. 1, at 152, Ex. 5 at 27-28.)  Nevertheless, as the train entered the United States from Canada, U.S. customs officials at the border placed a "hold" on one of its rail cars.  (Id. Ex. 1 at 152.)

Consequently, Kobe and Leggate had to remove or "set out" that "hold" car before the train could continue to its destination. (Id. at 149-50.)

To accomplish this, the crew broke apart the train, moved it onto a side track, and left the customs "hold" car on the side track. (Id. at 151, 157.) The crew then reconnected the rest of the train; in doing so, the engineer noted that he could not recharge, or pressurize, the air brake system (which runs by connecting air hoses from car to car throughout the length of the train). (Id. at 151-52, 155.) Kobe then inspected the train to determine the cause of the problem and discovered that the last car of the train, No. 7421, had a leaking vent valve. (Id. at 150, 159.) Kobe was unable to fix the problem, requiring the crew to remove this rail car to a side track. (Id. at 161.) To accomplish this, the crew moved the train past the switch leading to the side track and Kobe directed the engineer to back the train onto the side track. (Id. at 163.) Kobe then boarded the rail car by stepping on a sill step.[1] (Id.) In the process of boarding, the sill step gave way and Kobe fell from the train and was injured. (Id.)

Photographs of the rail vehicle after the accident revealed a bolt missing from the left end of the sill step. (Id. at Ex. 8.) A CN mechanical manager arrived at the scene two days later to inspect the sill step and confirmed that "it was broken" and was missing a bolt. (Unger Aff. Ex. 2 at 14.) This action against CN and DWP followed.

---

[1] "Sill steps are provided so that a person climbing on or off the car has an intermediate step to help boost him to the rail car or lower him to the ground." Grimming v. Alton & S. Ry. Co., 562 N.E.2d 1086, 1089 (Ill. App. Ct. 1990).

3

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**ANALYSIS**

**I.   Whether CN was Kobe's Employer**

FELA places liability on a rail carrier for "any person suffering an injury *while he is employed* by such carrier in commerce . . . ."  45 U.S.C. § 51 (emphasis added).  CN argues that it should be dismissed from this action because it did not employ Kobe within the meaning of FELA at the time he was injured.  (Defs.' Mem. at 5-8.)  In response, Kobe argues that at a minimum, the record establishes that CN was his employer, or that

4

a genuine issue of material fact exists with respect to this issue, requiring it to be resolved by a jury. (Pl.'s Mem. at 9-11.)

Whether a company is an "employer" for purposes of FELA is a fact question for the jury. Baker v. Tex. & Pac. Ry. Co., 359 U.S. 227, 228 (1959). The U.S. Supreme Court has established the standard for determining whether an individual is "employed" by a railroad within the meaning of FELA. Kelley v. S. Pac. Co., 419 U.S. 318, 322-26 (1974). A plaintiff can establish "employment" with a railroad under FELA even while nominally employed by another if he is: (1) a borrowed servant of the railroad, (2) a servant acting for two masters simultaneously, or (3) a subservant of a company that was in turn a servant of the railroad. Id. at 324. Similarly, the Eighth Circuit has held that the overriding consideration in determining employee status under FELA is whether the railroad had control of (or the right to control) the worker in the performance of his or her job. Vanskike v. ACF Indus., Inc., 665 F.2d 188, 198 (8th Cir. 1981).

Here, CN argues that it has never employed Kobe in any capacity. (Novak Aff. at ¶ 6.) It points to Kobe's W-2 IRS forms for the years 1997-2004, which listed DWP, not CN, as his employer. (Novak Aff. at ¶ 5.) Kobe, however, has always considered himself as an employee of both DWP and CN. (Gerth Aff. Ex. D. at 72-73.) Kobe also asserts that CN had control of, or the right to control, the performance of his job. For example, CN provided him with his daily work assignments and the equipment or tools needed to perform his job. (Kobe Resp. Aff. at ¶ 2.) CN also provided Kobe with a rulebook that included safety rules and a set of instructions on how he is to perform his job, including recommended practices for remaining injury-free on the railroad. (Id. Ex.

5

7.) In addition, the collective bargaining agreement ("CBA") that governed the terms and conditions of Kobe's employment provided that it was "[a]n agreement between Canadian National Railway, CN, and its employees represented by the United Transportation Union (on the former DWP)." (Unger Resp. Aff. Ex. 6 at 1, 41.) The CBA defined "the Company" as "Canadian National/Duluth, Winnipeg, and Pacific Railway Ltd." and the CBA was "Approved" under a column labeled "For the CN" by, among others, an official described as "V.P.-Labor Relations North America". (Id. at 5-6.) Kobe's immediate supervisors also wore clothing with the CN logo/name. (Kobe Resp. Aff. at ¶ 2.)

At the time of Kobe's injury, he was supervised by Chad Anderson, superintendent of the "Wisconsin West Zone" of CN. (Id. Ex. 10 at 8-14.) Anderson prepared Kobe's injury report, which had the heading "CN U.S. Properties" and indicated that such form "*must* be completed by each employee injured on duty *before* leaving company property . . . ." (Id. Ex. 10 at Dep. Ex.) (emphasis added).) Furthermore, a risk management employee of CN has handled matters related to Kobe's medical care, disability status, and wages. (Kobe Resp. Aff. at ¶ 3.)

In light of the foregoing, and when viewed in the light most favorable to Kobe, a reasonable jury could conclude that CN was Kobe's employer at the time of his injury. Indeed, a reasonable jury could also find that both CN and DWP were Kobe's employers. Vanskike, 665 F.2d at 199. Accordingly, the Court will deny CN's Motion and will submit this issue to the jury for resolution.

**II.    Standard for Liability under the FSAA and FELA**

The FSAA does not create an independent cause of action; FELA, however, allows employees injured by violations of the FSAA to sue for damages. Crane v. Cedar Rapids & Iowa City Ry. Co., 395 U.S. 164, 166 (1969). The FSAA provides different safety requirements for rail vehicles, locomotives, and trains. A railroad carrier is allowed to use a "vehicle" on its lines only if it is equipped with couplers, secure sill steps, efficient handbrakes, secure ladders, and secure running boards. 49 U.S.C. § 20302(a)(1- 3). A "locomotive" may only be used if it is equipped with a "power-driving wheel brake and appliances for operating the train-brake system." 49 U.S.C. § 20302(a)(4). A railroad carrier may use a "train" on its lines only if "enough of the vehicles in the train are equipped with power or train brakes so that the engineer on the locomotive hauling the train can control the train's speed without the necessity of brake operators using the common hand brakes for that purpose." 49 U.S.C. § 20302(a)(5).

The FSAA creates an absolute duty on the railroad -- a railroad is liable for an injury resulting from a violation of the FSAA, even if it was not negligent. Brady v. Terminal R.R. Ass'n, 303 U.S. 10, 13 (1938). However, as a threshold matter, liability only exists under the FSAA if a defective rail car was "in use" at the time of the incident. Id. at 13. A determination of whether a rail car is "in use" is a question of law for the Court. Steer v. Burlington N., Inc., 720 F.2d 975, 977 n.4 (8th Cir. 1983).

Here, the applicable safety provision requires that a rail vehicle may only be used if it is equipped with secure sill steps. 49 U.S.C. § 20302(a)(1)(B). Therefore, the Court must determine whether the rail vehicle was in use at the time of Kobe's injury. The

7

Eighth Circuit has not specifically addressed the appropriate analysis for determining whether a rail vehicle is in use. However, it has held that "[l]ocomotives being serviced in a place of repair are not 'in use' within the meaning of the Boiler Inspection Act." Steer, 720 F.2d at 976 n.3 (noting that the analysis of "in use" under the FSAA is applicable to a construction of the Boiler Inspection Act). Indeed, the Eighth Circuit found that "[c]ongressional intent and the case law construing the statute clearly *exclude those injuries* directly resulting from the inspection, repair, or servicing of railroad equipment *located at a maintenance facility*." Id. at 976 (emphasis added) (quoting Angell v. Chesapeake and Ohio Ry. Co., 618 F.2d 260, 262 (4th Cir. 1980)).

In Steer, the plaintiff was in the process of repairing the locomotive off the main track when he was injured. Id. at 976. Notably, the Eighth Circuit distinguished this situation from one in which the defective rail car was in the process of being disengaged for removal to a repair area. Id. at n.2 (citing Chicago Great W. R.R. Co. v. Schendel, 267 U.S. 287, 289 (1925) (finding that FSAA applied where plaintiff was injured during attempt to detach damaged car and move it to side track)).

A review of the case law outside this jurisdiction shows that courts have applied various approaches to determining the "in use" standard. The Fifth Circuit has established a bright-line rule for determining whether a train is in use. Trinidad v. S. Pac. Transp. Co., 949 F.2d 187 (5th Cir. 1991). In Trinidad, the plaintiff was injured while performing an air-brake inspection prior to the departure of a train. Id. at 188. The Fifth Circuit held that a train is not in use until the train is fully assembled and the crew has completed its pre-departure inspections. Id. at 188-89.

8

In contrast, the Fourth Circuit rejected Trinidad's bright-line test and adopted a multi-factor test for determining "in use" status. See Deans v. CSX Transp. Inc., 152 F.3d 326, 329 (4th Cir. 1998); see also Phillips v. CSX Transp., Inc., 190 F.3d 285, 289 (4th Cir. 1999) (applying Deans approach). In Deans, the plaintiff was releasing the handbrakes on the rail vehicles so that the train could depart, but was injured when one of the handbrakes failed to work correctly; the crew had not yet completed its pre-departure inspections. Deans, 152 F.3d at 328. However, the court held that a determination of whether a train is in use should not be based solely on whether the crew has completed their pre-departure inspections because such a bright-line rule is too simplistic "to accurately reflect the multitude of steps required -- and various sequences in which these steps may be taken -- to prepare a train for departure." Id. at 329. The court reasoned that "a more consistent and fairer result is reached by looking at a number of different factors, rather than simply at the completion or noncompletion of pre-departure tests." Id. The court indicated that the primary factors in determining whether a train is in use are the location of the train at the time of the accident and the activity of the injured party.[2] Id.

---

[2] In Phillips, the court applied Deans and found that the plaintiff "was injured at the end of the switching process, rather than at the beginning of the departure process" and held that the train was not in use because "the FSAA does not apply to train cars involved in switching operations." Id. at 289-90 (citing United States v. Seaboard Air Line R.R., Co., 361 U.S. 78 (1959)). However, other courts have found this to be an inaccurate statement of the law. See e.g., Williams v. Norfolk S. Ry. Co., 126 F. Supp. 2d 986, 992 (W.D. Va. 2000) ("[T]his quote is an overly broad statement that is inessential to the court's decision in Phillips. Indeed, it appears to be a misstatement of the holding of Seaboard."); see also Hoemmelmeyer v. CSX Transp., Inc., No. 1:04-CV-00166, 2005 WL 2124259, at *5 (S.D. Ohio Aug. 30, 2005) ("[F]rom the inception of the FSAA, the safety of railroad workers involved in switching operations was clearly the

9

However, in <u>Underhill v. CSX Transp., Inc.</u>, No. 1:05-CV-196-TS, 2006 WL 1128619, at *3-6 (N.D. Ind. Apr. 24, 2006), the court carefully analyzed <u>Trinidad</u>, <u>Deans</u> and <u>Phillips</u>, and found that when a case involves a safety requirement that is applicable to a rail vehicle, "the question is whether th[at] vehicle was in use and cases deciding whether a train was in use have limited relevance." <u>Underhill</u>, 2006 WL 1128619, at *4. The court reasoned that this distinction is important because "under the FSAA, there are separate 'in use' inquiries depending on whether the usage of a vehicle, locomotive, or train is at issue." <u>Id.</u>  Notably, <u>Deans</u> and <u>Phillips</u> both involved FSAA requirements applicable to rail vehicles, but neither case distinguished between a <u>train</u> being in use versus a <u>rail vehicle</u> being in use. <u>Id.</u> at *5.  Indeed, both cases merely considered factors that were relevant in analyzing whether a <u>train</u> was in use and not whether a <u>rail vehicle</u> was in use. <u>Id.</u>  As <u>Underhill</u> correctly points out, both <u>Deans</u> and <u>Phillips</u>

> looked at whether [the] departure of a train was imminent[,] [but] [t]his factor has no application as to whether a vehicle was in use, as a plain understanding of the word 'use' suggests a vehicle used to assemble a train is in use, whether the train is about to leave or not. The factors cited as most important by <u>Deans</u> and <u>Phillips</u>, the activity of the party when he was injured and the location of the train or vehicle, are important factors, but must be considered in the context of the use of a vehicle, not the use of a train.

<u>Id.</u> (internal citations omitted).  Thus, the court in <u>Underhill</u> adopted the multi-factor approach set forth by the Fourth Circuit, but explained that such factors must be

---

object of Congress.  Clearly, Supreme Court and lower court precedent demonstrates this is the case.") (citing cases).

10

considered in the context of whether the usage of a vehicle, locomotive, or train is at issue.

Here, Kobe argues that the rail vehicle was in use at the time of his injury and that the Court should adopt the reasoning in Underhill and Schendel. In Schendel, the Supreme Court found that "the use, movement, or hauling of the defective car [to a side track] . . . had not ended at the time of the accident" because it was done so that the train could continue to its destination. Schendel, 267 U.S. at 291-92. Defendants, however, assert that the rail vehicle was not in use because it was located within the limits of a railyard and the removal of the "end of train device"[3] from the last car rendered the train as "not one that could be used in interstate commerce." (Defs.' Opp'n Mem. at 3-4.) Accordingly, Defendants urge this Court to follow Trinidad and find that the vehicle was not in use because the crew had not completed their pre-departure inspections. (Defs.' Supp. Mem. at 10, 12-13.) The Court finds that Trinidad is inapposite here because it only addressed whether the train was in use. Furthermore, the Court finds the bright-line rule employed in Trinidad is too rigid because a train or rail vehicle could remain "in use" as construed under the applicable FSAA provisions even though the crew continues to conduct its pre-departure inspections.

This Court is persuaded by the well-reasoned Underhill decision and adopts a facts-and-circumstances approach for determining the "in use" status and will apply such

---

[3] An end of train device is "a radio-controlled device connected to the last car on a train. It monitors the air pressure in the brake system and applies emergency brakes when necessary, taking the place of a caboose and permitting the train to operate without a person in the last car to monitor the brakes." Robinson v. CSX Transp., 838 N.Y.S.2d 203, 204-05 (N.Y. App. Div. 2007).

11

factors in the context of whether the usage of a vehicle, locomotive, or train is at issue. This case involves a safety requirement that is applicable to rail vehicles -- a vehicle may only be used if it is equipped with secure sill steps. Thus, the Court must decide whether this vehicle was in use at the time of Kobe's injury. The Court finds that the primary factors in determining whether a rail vehicle is in use are (1) the activity of the injured party and (2) the location of the vehicle at the time of the accident (as this may show whether a vehicle was being serviced or repaired at a maintenance facility). See Underhill, 2006 WL 1128619, at *5; see also Schendel, 267 U.S. at 291-92 (finding that rail car was in use where the plaintiff was injured during attempt to detach damaged car and move it to side track so that the train could continue to its destination).

### A.   The rail vehicle here was "in use"

Applying § 20302(a)(1)(B) and the law interpreting the statute as it applies to rail vehicles, the Court finds that rail vehicle No. 7421 was "in use" when Kobe was injured. The record shows that this vehicle was on the main track before the crew discovered that it had an air leak. It was Kobe's job to help move this vehicle off to a side track so that it could be cut from the train, which would then allow the train to continue to its destination. In order to accomplish this task, the crew needed to move the rail vehicle past the switch leading to the side track. Kobe directed the engineer to back the train onto the side track. Kobe then boarded the vehicle by stepping on a sill step, but it gave way and he fell from the train and was injured. Notably, this vehicle was not in a maintenance facility nor was it under repair when Kobe was injured.

12

The FSAA should be liberally construed in light of its purpose – the protection of railroad workers from injury and death. United States v. Seaboard Air Line R.R., Co., 361 U.S. 78, 83 (1959). The sill step is frequently used by railroad workers in moving and detaching cars from the train and it would defy common sense to interpret the FSAA so that the sill-step requirements did not apply when the sill steps are used regularly and railroad workers depend on them for their safety. Therefore, the Court finds that rail vehicle No. 7421 was "in use" at the time of Kobe's injury.

### B. Violation of § 20302(a)(1)(B)

Under FELA, a railroad is liable for an employee's injury or death caused by a violation of the FSAA. Crane, 395 U.S. at 166. "In such actions, the injured employee is required to prove only the statutory violation and thus is relieved of the burden of proving negligence[.]" Id. (citations omitted).

Here, the applicable FSAA provision provides that a railroad may use a rail vehicle on its lines only if it has secure sill steps. 49 U.S.C. § 20302(a)(1)(B). There is no material dispute that the rail vehicle's sill step was not "secure" when Kobe stepped on it. Defendants' photographs of the vehicle after the accident showed a bolt missing from the left end of the sill step. Also, a CN mechanical manager arrived at the scene two days later to inspect the sill step and confirmed that it was defective and not secure. That manager noted on his inspection report that the sill step was missing a bolt and that he "[r]epaired all defects listed." (Unger Aff. Ex. 4.)

Accordingly, the Court finds that Defendants violated 49 U.S.C. § 20302(a)(1)(B) and Kobe is entitled to partial summary judgment on the issue of liability.[4] Consequently, because the Court has found that Kobe has established strict liability as a matter of law, the Court need not and does not address Defendants' arguments concerning Kobe's negligence claim under FELA.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Defendant CN's Motion for Summary Judgment (Doc. No. 26) is **DENIED**;

2. Defendant DWP's Motion for Partial Summary Judgment (Doc. No. 26) is **DENIED**; and

3. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 31) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. **GRANTED** as to liability on his strict-liability claim under FELA for Defendants' violation of the FSAA.

    b. **DENIED** as moot as to liability on his negligence claim under FELA.

Date: September  18 , 2007

                                                S/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge

---

[4] The only issues that remain for trial are causation and damages.